**Jose Didiel MUNOZ, Petitioner,**

v.

**John ASHCROFT, Attorney General, Respondent.**

No. 01–71146.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 15, 2003.

Filed Aug. 8, 2003.

Elizabeth Berenguer and Taren Ellis (both argued), law students at the University of Arizona College of Law, under supervision of Willie M. Jordan–Curtis, Esq., Tucson, Arizona, for the petitioner.

Michelle R. Slack (argued), and Marion E. Guyton (on the brief), Office of Civil Immigration Litigation, U.S. Department of Justice, Washington, D.C., for the respondent.

Before TASHIMA, BERZON, and CLIFTON, Circuit Judges.

## OPINION

CLIFTON, Circuit Judge:

Jose Didiel Munoz entered the United States unlawfully when he was one year old, brought by his mother from Guatemala. He has lived in this country ever since. Now he is 24, and he faces removal from the United States pursuant to an order by an immigration judge ("IJ") finding him removable for entry without inspection. The Board of Immigration Appeals ("BIA") dismissed his appeal of that order, and now he petitions for review.

Munoz's arguments may be sorted into three contentions. First, noting that he has lived in this country effectively his entire life, Munoz argues that removing him would violate due process. Second, he contends that he was prejudiced by ineffective assistance of counsel at the hearing before the IJ. Third, based on the proposition that children cannot properly fend for their legal rights, Munoz argues that we should equitably toll, or extend pursuant to international law obligations, certain filing deadlines for aliens who, like himself, were children at the time of the filing dates. He notes that had certain filings been made on his behalf some years ago, his status today might be very different, and

further, that as a minor he was legally incapable of filing for himself.

With regret in light of the unusual factual circumstances, we conclude that Munoz's arguments are without merit and that we must deny his petition.

## I. BACKGROUND

Munoz, now 24 years old, is a native and citizen of Guatemala whose mother unlawfully brought him into the United States without being admitted or paroled on or about January 1, 1980. Munoz was one year old at the time and has resided in the United States since.

Munoz grew up in the United States, went to school here, graduated from high school, and generally established the customary roots and friendships. His mother lives in the United States, along with his half-brother and half-sister, both born in the United States (to his mother and his stepfather). In contrast, Munoz's ties to Guatemala are minimal at best. He does not know his biological father, who is a citizen and resident of Guatemala. We do not know what other family he may have in Guatemala, but there is no record evidence of any. Nor does anything in the record suggest that Munoz has visited Guatemala since arriving in the United States as an infant.

On August 23, 1997, after he turned 18, Munoz applied for asylum. In the application he stated that he wished his mother had filed for him long ago, but, now that he was an adult, he wanted to finally take care of his situation as an undocumented alien. The INS denied the application and issued a Notice to Appear, charging Munoz with removability under INA § 212(a)(6)(A)(i), 8 U.S.C.

§ 1182(a)(6)(A)(i), as an "alien present in the United States without having been admitted or paroled."

Munoz appeared with counsel at a hearing before an IJ. Upon the advice of counsel, he withdrew his request for asylum and withholding of removal. The IJ verified with Munoz that he was voluntarily withdrawing those claims with knowledge of the consequences.

In an oral decision, the IJ held that Munoz was subject to the Illegal Immigration Reform and Immigrant Responsibility Act, Pub L. No. 104–208, 110 Stat. 3009 (Sept. 30, 1996) ("IIRIRA"), because he was not charged by the INS until April 13, 1998, well after IIRIRA's April 1, 1997 effective date. The IJ noted that in order to qualify for cancellation of removal under IIRIRA, the applicant must meet a 10-year continuous residency requirement, have good moral character, and establish that removal would result in exceptional and extremely unusual hardship to a U.S. citizen or lawful permanent resident parent, spouse, or child.[1] Although Munoz met the residency and good moral character requirements, the IJ held Munoz to be removable as charged because he lacked a qualifying relative upon whom hardship would fall. At the time of the IJ's hearing, Munoz's mother was not a lawful permanent resident or citizen of the United States, and therefore she did not qualify. *See* 8 U.S.C. § 1229b(b)(1)(D). The IJ focused on whether Munoz's stepfather was a qualifying relative for cancellation of removal purposes. (Munoz's mother had recently married a lawful permanent resident.) The IJ, applying the statutory definitions of family members, concluded that

---

1. Before IIRIRA, extreme hardship to the alien himself was included as a factor supporting cancellation of removal. *See Romero–Torres v. Ashcroft*, 327 F.3d 887, 889 & n. 4 (9th Cir.2003) (discussing suspension of deportation standards under 8 U.S.C. § 1254(a)(1)).

because Munoz was 18 when his mother got married, his stepfather could not qualify as a statutory "parent." *See* 8 U.S.C. § 1101(b)(1). (If Munoz's mother had married before Munoz turned 18, then the stepfather would have qualified as a "parent" under IIRIRA.) Munoz's U.S.-born brother and sister could not be qualifying relatives under IIRIRA, either. Only parents, children, or spouses can be qualifying relatives. *See* 8 U.S.C. § 1229b(b)(1)(D); *see also Jimenez–Angeles v. Ashcroft*, 291 F.3d 594, 597(9th Cir.2002). Accordingly, the IJ found Munoz removable as charged, denied cancellation of removal, and granted voluntary departure.

Munoz appealed to the BIA, and the BIA summarily affirmed the IJ's decision without opinion, pursuant to 8 C.F.R. § 3.1(a)(7) (now 8 C.F.R. § 1003.1(a)(7)). This petition followed.

## II. STANDARD OF REVIEW

■ Since the BIA adopted the IJ's findings, we review the IJ's decision. *Gui v. INS*, 280 F.3d 1217, 1225 (9th Cir.2002). Findings made by the IJ are reviewed for substantial evidence and will be upheld "unless the evidence compels a contrary conclusion." *Hernandez–Montiel v. INS*, 225 F.3d 1084, 1090–91 (9th Cir.2000) (internal quotation marks and citation omitted). Other standards of review are indicated below.

## III. DISCUSSION

### A. *Due Process*

■ Munoz contends that because he has resided in the United States virtually his entire life and his only family and friends live in the United States, removing him to Guatemala would amount to a violation of due process. Essentially, he argues that he has acquired a substantive due process right to stay in the United States due to his unique circumstances.

We review constitutional challenges to application of a statute de novo. *Eunique v. Powell*, 302 F.3d 971, 974 (9th Cir.2002).

■ The substantive due process argument fails. In the immigration context, courts have "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210, 73 S.Ct. 625, 97 L.Ed. 956 (1953); *see also Fiallo v. Bell*, 430 U.S. 787, 794, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977); *Duldulao v. INS*, 90 F.3d 396, 399 (9th Cir. 1996). Since discretionary relief is a privilege created by Congress, denial of such relief cannot violate a substantive interest protected by the Due Process clause. *See INS v. Yang*, 519 U.S. 26, 30, 117 S.Ct. 350, 136 L.Ed.2d 288 (1996) (recognizing the Attorney General's "unfettered discretion" to award suspension of deportation); *Hernandez–Mezquita v. Ashcroft*, 293 F.3d 1161, 1165 (9th Cir.2002) (because "the very liberty interest he asserts to have been taken away by NACARA was granted by that same statute[,] ... [he] cannot contend that [it] violated due process by depriving him of a right he never had"); *Tefel v. Reno*, 180 F.3d 1286, 1301 (11th Cir.1999) ("[n]o constitutionally protected interest arises from the INS' actions in granting or denying applications for suspension"). Notwithstanding Munoz's unique circumstances, he has no substantive due process right to stay in the United States.

### B. *Ineffective Assistance of Counsel*

■ Munoz argues that his attorney ineptly cost him his chance to gain asylum by pressuring him to abandon his asylum application, thereby violating his procedural due process rights. " 'Ineffective assis-

tance of counsel in a deportation proceeding is a denial of due process under the Fifth Amendment if the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case.'" *Ortiz v. INS*, 179 F.3d 1148, 1153 (9th Cir.1999) (quoting *Lopez v. INS*, 775 F.2d 1015, 1017 (9th Cir.1985)). The petitioner must show prejudice from counsel's alleged deficient performance. Prejudice results when "the performance of counsel was so inadequate that it may have affected the outcome of the proceedings." *Ortiz*, 179 F.3d at 1153(citation omitted). Claims of due process violations in INS proceedings are reviewed de novo. *Rodriguez–Lariz v. INS*, 282 F.3d 1218, 1222 (9th Cir.2002).

■ Munoz fails to demonstrate either deficient performance or the required prejudice. If Munoz's asylum application had merit, it might well have been unreasonable and prejudicial for his attorney to pressure him to drop it. But Munoz has not demonstrated that he qualified for asylum. To qualify for asylum, an applicant must demonstrate past persecution or a well-founded fear of persecution on account of one or more characteristics: "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42); *Ortiz*, 179 F.3d at 1153. Munoz does not allege and cannot show past persecution. And to establish a well-founded fear of future persecution, the applicant must establish the fear by "credible, direct, and specific evidence." *Velarde v. INS*, 140 F.3d 1305, 1310 (9th Cir.1998). Here, the record contains no evidence that could establish a well-founded fear of persecution on account of any of the enumerated grounds if Munoz were removed to Guatemala.[2] Accordingly, Munoz cannot show deficient performance or prejudice stemming from counsel's advice to withdraw his asylum application.

## C. *Extension of NACARA's Filing Deadlines*

### 1. *NACARA Background*

Based on concerns about massive deportations of longterm residents from Honduras, Nicaragua, El Salvador, and Guatemala with the passage of IIRIRA, Congress, soon thereafter, passed the Nicaraguan Adjustment and Central American Relief Act, Pub.L. No. 105–100, 111 Stat. 2160(Nov. 19, 1997) ("NACARA"), which amended IIRIRA. NACARA allows certain individuals to apply for what is known as "special rule cancellation," which allows designated aliens to qualify for the more generous pre-IIRIRA suspension of deportation remedy, even though not charged by the INS until after

---

2. Rather than advance a colorable basis for asylum, Munoz stated the following in his application for asylum, recited here verbatim:
In fact, my mother is the person who should have requested for asylum due that she was persecuted in Guatemala and she had to escape from there carrying me in her arms. I was a baby of a few months of age when I came to this country. And now I am a teenager of 17 years with the desire to improve myself. But, to be illegal in this country takes away the opportunity to become someone with a good future. To tell the truth, I cannot go back to my country since I have spent all my life in the United States. My school is here. My friends are here. And my brother have born here. If I return to Guatemala, according to what I have heard, it will be like entering to hell because Guatemala is in a very bad situation due to the 36 years of war that left a terrible foregoing there. And the only through of it make me feel scare. I believe that my mind wouldn't stand to be in another country if it's not the United States since I consider it as my country even though I was not born here. For these reason, I am asking you to provide me with the opportunity to obtain the asylum I am requesting.

IIRIRA's effective date (April 1, 1997). For example, nationals from Guatemala who filed for asylum on or before April 1, 1990 are eligible for special rule cancellation even if otherwise subject to IIRIRA. *See* IIRIRA § 309(c)(5)(C)(i)(II), *as amended by* NACARA § 203; *see also Hernandez–Mezquita*, 293 F.3d at 1162–63 (discussing the April 1, 1990 asylum filing deadline). In addition, Guatemalan nationals who, *inter alia*, entered the United States on or before December 1, 1990, and registered for American Baptist Churches ("ABC") settlement benefits on or before December 31, 1991, are also eligible to apply for special rule cancellation. *See* IIRIRA § 309(c)(5)(C)(i)(I)(bb), *as amended by* NACARA § 203(a)(1); *see also Hernandez–Mezquita*, 293 F.3d at 1162–63 (citing *American Baptist Churches v. Thornburgh*, 760 F.Supp. 796 (N.D.Cal.1991)). For Munoz, who has over twenty years of residency in the United States and good moral character (so far as the record before us indicates), special rule cancellation would likely make all the difference: He would not need to demonstrate that a qualifying relative would suffer hardship if Munoz were required to leave the United States, which is the showing required under IIRIRA. It would be sufficient under the pre-IIRIRA remedy of suspension of deportation for Munoz to show that Munoz himself would suffer extreme hardship if required to leave the country, which seems evident under the circumstances. With that background, we address his arguments.[3]

## 2. *Equitable Tolling*

■ Munoz points to the unfairness of penalizing an alien for not filing an asylum application by the April 1, 1990 cutoff date set by NACARA when that alien was a child at the time and the guardian did not file the application. Munoz argues that we should adopt an "equitable tolling" rule, whereby NACARA's retroactive deadline for filing for asylum would be "tolled" for NACARA-qualified aliens who were minors on April 1, 1990, and would stay tolled until one year after the alien's 18th birthday, to allow a window of time in which to file once the alien reached the age of majority. Munoz presents the same equitable tolling argument with regard to the December 31, 1991 deadline to apply for ABC benefits.

To support this new equitable tolling rule, Munoz notes that minor-aliens have been held not to have the legal capacity to file for asylum, *see, e.g., Gonzalez v. Reno*, 212 F.3d 1338, 1351 (11th Cir.2000). Munoz also analogizes to ineffective assistance of counsel cases where the alien is not penalized for his attorney's ineptitude in failing to file critical paperwork that a reasonable lawyer would have filed. *See generally Magallanes–Damian v. INS*, 783 F.2d 931 (9th Cir.1986). Finally, Munoz likens a minor's situation to that of a prisoner who, due to external forces beyond his control, was unable to timely file within the limitations period. *See, e.g., Miles v. Prunty*, 187 F.3d 1104, 1107 (9th Cir.1999).

■ Equitable tolling is not possible in this case, though. It is true that equitable tolling is available in INA cases, as there is a "presumption, read into every federal statute of limitation, that filing deadlines are subject to equitable tolling [and that] the same rebuttable presumption of equitable tolling ... applies in suits against private defendants and ... in suits against the United States." *Socop–Gonzalez v.*

---

**3.** These NACARA-based arguments were developed and presented by students from the University of Arizona College of Law, acting pro bono. We appreciate and commend their efforts.

*INS,* 272 F.3d 1176, 1188 (9th Cir.2001) (en banc) (internal quotation marks and citations omitted). But we are not dealing with a limitations period here. Rather, Congress created a statutory cutoff date of April 1, 1990(asylum application deadline to qualify under NACARA), or December 31, 1991 (ABC benefits). We cannot "toll" this type of cutoff date.

■■■■■ There is a crucial distinction in the law between "statutes of limitations" and "statutes of repose." Statutes of repose are not subject to equitable tolling. *Lampf, Pleva, Lipkind, Prupis & Peti-grow v. Gilbertson,* 501 U.S. 350, 363, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) ("The 3–year limit is a period of repose inconsistent with tolling.... Because the purpose of the 3–year limitation is clearly to serve as a cutoff, ... tolling principles do not apply to that period."); *see generally* 4 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d § 1056, at 255 n. 38 (1994). A statute of repose is a fixed, statutory cutoff date, usually independent of any variable, such as claimant's awareness of a violation. *Cf. Lampf,* 501 U.S. at 363, 111 S.Ct. 2773 (3 year absolute cutoff from when plaintiff accrues cause of action imposed outer limit for a 1–year limitations period, thereby functioning as a statute of repose); *Weddel v. Sec'y of HHS,* 100 F.3d 929, 930–32 (Fed.Cir.1996) (under the Vaccine Act, which became effective on October 1, 1988, a party who was vaccinated before the effective date had until October 1, 1990, to file a petition for benefits; the fixed date amounted to a statute of repose).

The *Weddel* court described a statute of repose as a statute that "cuts off a cause of action at a certain time irrespective of the time of accrual of the cause of action." *Id.* at 931. The Vaccine Act, the court noted:

clearly sets out a date certain which cuts off entitlement to benefits.... The

deadline created a condition that *defined and closed the class.* The deadline was *set on the day the statute went into effect* and bore *no relation* to the date on which the vaccination occurred or on which the Weddels' claim accrued.

*Id.* at 932 (emphasis added). Similarly, in *Iacono v. Office of Personnel Management,* 974 F.2d 1326 (Fed.Cir.1992) (cited by *Weddel* ), a widow brought a claim for spousal annuity benefits under the Civil Service Retirement Spouse Equity Act of 1984. The Act required that she file "on or before May 7, 1989." *Id.* at 1327. The widow did not file until 1990. *Id.* The court held:

The statutory deadline at issue here is similar to a statute of limitations in but one respect: both function as filing deadlines. However, the statutory deadline in the Spouse Equity Act does not await a specific event to start the deadline clock, as typically does a statute of limitation. Rather, the 1989 deadline served as the *endpoint of the definite time period in which Congress would permit a specific class of potential annuitants to file applications.* Thus, the filing deadline in the Spouse Equity Act functions as a *condition defining and closing the class.*

*Id.* at 1328 (emphasis added) (internal citation omitted).

Here, the NACARA filing deadline is a cutoff date similar to the ones just discussed. It is fixed by statute and unrelated to any variable. It was even set years after the fact—NACARA was enacted in 1997 but set 1990 and 1991 filing deadlines. In setting NACARA's retroactive cutoff dates, Congress closed the class via a statute of repose, thereby precluding equitable tolling.

### 3. *International Law*

■■■ Munoz argues that application of the NACARA deadline to a then-minor

alien violates certain obligations to protect children under international law, citing specifically three sources of international law: the International Covenant on Civil and Political Rights, the Convention on the Rights of the Child, and the Universal Declaration of Human Rights. He contends that we should interpret the statute in accordance with those obligations and extend the cutoff dates for such aliens until they reach the age of majority and can file for themselves. This argument fails.

■ "In enacting statutes, Congress is not bound by international law; if it chooses to do so, it may legislate contrary to the limits posed by international law," so long as the legislation is constitutional. *United States v. Aguilar*, 883 F.2d 662, 679 (9th Cir.1989) (internal quotation marks, citation, and alterations omitted); *see also Alvarez–Mendez v. Stock*, 941 F.2d 956, 963 (9th Cir.1991) (citing *Aguilar*).

■ [9] While Congress may legislate beyond the limits posed by international law, it is also well settled that an act of Congress should be construed so as not to conflict with international law where it is possible to do so without distorting the statute. *See Murray v. The Schooner Charming Betsy*, 2 Cranch 64, 6 U.S. 64, 118, 2 L.Ed. 208 (1804); *see also* Restatement (Third) of Foreign Relations Law § 114 (1987) ("Where fairly possible, a United States statute is to be construed as not to conflict with international law or with an international agreement with the U.S."). Assuming *arguendo* that international law norms would protect children in the manner Munoz asserts, the question, then, is whether the statute can fairly be construed to provide for an extension of the cutoff date for aliens who were minors at the relevant times. We do not believe that it can. The language of the statute provides absolutely no support for such a construction. In setting the retroactive cutoff date, Congress never suggested or hinted that the date could budge under special circumstances. *See* IIRIRA § 309(c)(5)(C)(i)(II), *as amended by* NACARA § 203 (discussing asylum cutoff date); IIRIRA § 309(c)(5)(C)(i)(I)(bb), *as amended by* NACARA § 203(a)(1) (discussing ABC benefits cutoff date).

Moreover, were we to extend the cutoff for aliens who were minors at the time, we would create a "vesting schedule" which would leave the door open for some applicants until March 31, 2009 (asylum) and December 30, 2010(ABC benefits).[4] This would perpetuate pre-IIRIRA law for a class of aliens until 12 to 13 years after IIRIRA went into effect, extending the cutoff for 19 years at its outer limit. That is squarely at odds with the plain language of the statute. Accordingly, we must reject Munoz's argument, even if the statute does somehow conflict with international law. *See Aguilar*, 883 F.2d at 679.

## IV. OBSERVATION

We cannot leave this case without a further comment. We deny Munoz's petition because that is the proper conclusion under the statute and relevant precedent. But the result—removal of Munoz from the only country he has ever consciously known—appears pointless and unjust. We acknowledge that we may not have a complete picture because it has not been our place to investigate the details of Munoz's

---

4. March 31, 2009 is the last theoretically possible date at which an alien who was a minor on April 1, 1990 could file for asylum and trigger special rule cancellation (assuming that person was 1 day old on April 1, 1990 and had been brought into the United States on that date). December 30, 2010 is the same final "vesting" date for the "tolling" of the December 31, 1991 ABC cutoff.

life. From the record before us, though, there is no indication that Munoz is anything other than a law-abiding, contributing member of our society. He cannot be faulted for the fact that his mother smuggled him into the country when he was a baby. His mother was the person who did something "wrong." Ironically, she is now allowed to stay here, while he faces exile to a country to which he is a stranger. Munoz's plight is made even more painful because he has missed out on opportunities to resolve his legal problem through no fault of his own. He cannot qualify under NACARA because his mother did not submit an application for asylum for him by the statutory deadline. His stepfather cannot serve as a qualifying relative because his mother and stepfather did not marry until after Munoz turned 18. Unlike some other petitioners who have come before us, Munoz gives no indication of doing anything to manipulate the system. Indeed, aware of his unlawful status, he appears to have applied for asylum after he turned 18 in a deliberate effort to bring himself within the law. It may well have been that act which brought Munoz to the attention of the INS and started him down the road to deportation. If so, it is a cruel twist for that outcome to result from trying to do the right thing. We are unable to grant Munoz's petition, but we hope that appropriate officials within the executive branch, or possibly Congress, will take a careful look at this case and, if the facts are truly as they appear to us, consider whether removal of Munoz is really the just and proper result here.[5]

## V. CONCLUSION

We must deny Munoz's petition.

**PETITION FOR REVIEW DENIED.**

---

5. For example, we note that the immigration regulations provide for an "administrative stay of removal" upon the alien's filing of a Form I 246. *See* 8 C.F.R. § 241.6 (referring *inter alia* to 8 U.S.C. § 1231(c)(2)(A) (describing cases in which "immediate removal is not practicable or proper"), as providing guidance for when a stay should be issued); *see also* 8 U.S.C. § 1231(a)(7) (allowing employment authorization for an alien ordered removed if "the Attorney General makes a specific finding that ... the removal of the alien is ... contrary to the public interest").