# United States Court of Appeals for the Federal Circuit

06-3092


CHRISTINE NIXON,

Petitioner,

v.

OFFICE OF PERSONNEL MANAGEMENT,

Respondent.


Christine Nixon, of Conroe, Texas, pro se.

Doris S. Finnerman, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, for respondent. With her on the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Donald E. Kinner, Assistant Director.


Appealed from: United States Merit Systems Protection Board

# United States Court of Appeals for the Federal Circuit

06-3092

CHRISTINE NIXON,

Petitioner,

v.

OFFICE OF PERSONNEL MANAGEMENT,

Respondent.

_____

DECIDED:   June 28, 2006

_____

Before MICHEL, <u>Chief Judge</u>, SCHALL, and DYK, <u>Circuit Judges</u>.

Opinion for the court filed by <u>Circuit Judge</u> DYK.  Dissenting opinion filed by <u>Chief Judge</u> MICHEL.

DYK, <u>Circuit Judge</u>.

Christine Nixon petitions for review of the final decision of the Merit Systems Protection Board ("the Board").  The Board affirmed the decision of the Office of Personnel Management ("OPM") denying the petitioner's request for survivor annuity benefits under the Civil Service Retirement System ("CSRS").  <u>Christine Nixon v. Office of Pers. Mgmt.</u>, No. DA-0831-04-0733-I-1, slip op. (M.S.B.P. Apr. 15, 2005) ("Initial Decision").  We vacate and remand.

## BACKGROUND

Robert Nixon worked in the federal civilian service, and participated in the CSRS retirement program.  Mr. Nixon and his then-wife Judy Nixon were divorced.  On April 10, 1992, they entered into a divorce agreement that provided Mr. Nixon's former

spouse with CSRS survivor benefits. OPM received a copy of the divorce agreement. Mr. Nixon retired on June 26, 1994. His monthly annuity was reduced because of the provision of survivor benefits to his former spouse.

Mr. Nixon's former wife remarried on March 18, 1998, at age 47. At that point, she became ineligible for survivor benefits because, under 5 U.S.C. § 8341(h)(3)(B)(i), a former spouse becomes ineligible for survivor annuity benefits upon remarriage before reaching age 55. The divorce agreement contained a similar provision. Mr. Nixon apparently requested information from OPM about the requirements for terminating his ex-wife's survivor benefits. By letter dated November 13, 1998, OPM informed Mr. Nixon that: "OPM will not develop for your former spouse's marriage certificate. It is her or your responsibility to notify OPM by sending a copy of the marriage certificate. A certified copy of the marriage [certificate] can be obtained from the jurisdiction in which she was married. It is a public record." App. at 16. It appears that Mr. Nixon made attempts to contact his former spouse directly, and that she refused to cooperate. He also made efforts to contact her through her former attorney, who declined to assist Mr. Nixon. Mr. Nixon then made unsuccessful efforts to secure the marriage certificate from public records.

Mr. Nixon married Christine Nixon (formerly Christine Walker) on December 22, 1999. In order to provide survivor benefits to his new wife under the CSRS, Mr. Nixon was required to make a written election within two years of their marriage. 5 U.S.C. § 8339(k)(2)(A) (2000).[1] On September 4, 2001, Mr. Nixon sent OPM an e-mail

---

[1] "[A] survivor annuity may be divided into a combination of former spouse annuities and a current spouse annuity so long as the aggregate total . . . does not exceed the maximum limitation . . . ." 5 C.F.R. § 831.641(b) (2005). Amounts allocated

explaining his desire to substitute survivor benefits for his new wife for those being provided to his ex-wife:

> I was married on 12/29/99 and have not sought survivor benefits for my current wife because I have been trying since July 1998 to have my ex-wife taken off because she remarried before age 55. I have been unsuccessful in finding a copy of my ex-spouse's marriage license and your agency will not contact her to ask for a copy. The two year limit since I married my current wife is fast approaching so if I can't get her the whole[ ] [s]urvivor annuity I need to get her the remaining portion of my annuity.

App. at 17. On September 21, 2001, OPM responded, informing Mr. Nixon of the need to elect survivor benefits for his new wife within two years of their marriage. OPM also stated that Mr. Nixon could "still elect the maximum survivor benefit for your spouse and then at a later date provide our office with a copy of her marriage certificate," apparently referring to the certificate from his former spouse's remarriage. App. at 18. Mr. Nixon subsequently informed OPM by letter that he was unable to obtain a copy of his former spouse's marriage certificate despite having "caused to be searched the public records of the whole state of California with negative results," and, after providing his former spouse's married name and mailing address, he asked OPM to "write her a letter requesting a copy of her Marriage Certificate since I have no way of obtaining it myself." App. at 19.[2] Evidently concerned about the cost of providing benefits for both his current and former spouse, Mr. Nixon asked OPM to "determine what amount of

_____

to former spouse survivor benefits by a court order may not be reallocated to a current spouse, 5 C.F.R. § 831.631(c) (2005), until the former spouse becomes ineligible "because of death or remarriage of the former spouse, or by operation of a court order . . . ." 5 C.F.R. § 831.641(c) (2005); see also 5 C.F.R. § 831.644(b) (2005) (stating that remarriage before age 55 terminates eligibility for former spouse survivor benefits).

[2] The petitioner states that Mr. Nixon's former spouse's marriage certificate was not publicly available pursuant to California's confidential marriage statute, Cal. Fam. Code §§ 500-536 (West 2004).

survivor annuity . . . my current spouse is entitled [to] and how much my annuity would be reduced if we should make that election." Id.

On October 10, 2001, OPM informed Mr. Nixon that electing maximum survivor benefits for his current spouse would entail an additional monthly reduction in his annuity of $649, which would entitle his current spouse to receive $2,340 per month upon Mr. Nixon's death. OPM noted that "[i]n the event your former spouse would lose her court awarded benefits the monthly survivor rate [for your new spouse] would automatically increase to $2,876." App. at 20.[3] OPM also advised Mr. Nixon that "it is your burden to provide our office with a copy of your former spouse['s] marriage certificate." Id. at 21. Mr. Nixon did not respond, and it is undisputed that he did not submit to OPM a formal, written election of survivor benefits for his new wife. On January 8, 2002, OPM by letter notified Mr. Nixon that the time limit for electing survivor benefits for his new wife had elapsed. Mr. Nixon died on May 15, 2004.

In the course of the Board proceeding, OPM admitted that Mr. Nixon's ex-wife was ineligible for survivor benefits retroactive to March 18, 1998, when she remarried. Thus, during the entire period between the time of his former wife's remarriage in 1998 and his death in 2004, Mr. Nixon's annuity was reduced each month to pay for survivor annuity benefits to which his former wife was not entitled.

On June 2, 2004, the petitioner requested survivor benefits from OPM. OPM denied her request on August 24, 2004, on the ground that Mr. Nixon did not make the

---

[3]    Contrary to this letter, there is some suggestion in OPM's August 24, 2004, decision that, pursuant to the divorce agreement, Mr. Nixon had elected maximum survivor benefits for his former wife. If this were the case, it appears that he would not have been entitled to make an election for his new wife until his former wife's benefits had been terminated. See 5 C.F.R. § 831.631(c) (2005).

required election.  She appealed to the Board.  In an April 15, 2005, initial decision, the Administrative Judge affirmed, concluding that "the appellant's deceased spouse did not file an election and the record establishes no basis for disregarding the express statutory language which requires such election . . . ."  Initial Decision at 4.  Addressing petitioner's argument that OPM had committed harmful error by failing to independently establish whether Mr. Nixon's ex-wife was still entitled to a survivor annuity, the Administrative Judge stated that petitioner had

> failed to show that OPM was required to contact [Judy Nixon] after Robert Nixon had informed OPM that she had remarried before the age of 55. The regulations instead make it clear that, if [Judy Nixon] remarried before the age of 55, she was obligated to advise OPM that she had remarried within 15 days of her marriage . . . .  It is understandable that the petitioner and her deceased husband felt exasperated by the situation.  However, the appellant did not show that OPM's regulations required it to take any certain action after Robert Nixon advised OPM that his former spouse had remarried.

Id. at 5-6 (emphases added).  The Administrative Judge thus concluded that OPM did not commit harmful error by advising Mr. Nixon that it was not obligated to undertake efforts to determine Judy Nixon's marital status and that Mr. Nixon had to submit the marriage certificate from his ex-wife's remarriage in order to terminate her survivor benefits.  The Board's decision became final when the petitioner's request for review by the full Board was denied on October 11, 2005.

The petitioner timely sought review in this court.  We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(9).

DISCUSSION

We will affirm the Board's decision unless it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; obtained without procedures

required by law, rule or regulation; or unsupported by substantial evidence. 5 U.S.C. § 7703(c) (2000); Yates v. Merit Sys. Prot. Bd., 145 F.3d 1480, 1483 (Fed. Cir. 1998).

The petitioner contends that Mr. Nixon failed to formally elect survivor benefits for her because OPM's communications were misleading as to what was required in this case to substitute current-spouse survivor benefits for former-spouse survivor benefits when the former spouse had remarried. Mr. Nixon was concerned about the cost of adding benefits for the petitioner without terminating the deduction for his ex-wife's benefits; OPM's communications led Mr. Nixon to believe that he could not satisfy OPM's requirement for terminating the former-spouse benefits. The petitioner argues that Mr. Nixon's intent to grant her a survivor annuity should be controlling, and that the Board's denial of her request for benefits was not in accordance with law.

I

We first consider whether OPM was obligated to accurately inform Mr. Nixon about the costs of electing survivor benefits for his new wife and the mechanism for terminating his ex-wife's benefits upon her remarriage. We conclude that such notice was required.

Under the Spouse Equity Act, "[t]he Director of the Office of Personnel Management shall, on an annual basis, inform each annuitant of such annuitant's rights of election under sections 8339(j) and 8339(k)(2) of title 5, United States Code . . . ." 5 U.S.C. § 8339 note (2000). Thus, "OPM is required to send annual notices to all annuitants . . . relating to changes they are entitled to make to their survivor annuity elections upon termination of a marriage by divorce, annulment, or death, or remarriage, after retirement." Hairston v. Office of Pers. Mgmt., 318 F.3d 1127, 1129 (Fed. Cir.

2003). This notice is mandatory, <u>Brush v. Office of Pers. Mgmt.</u>, 982 F.2d 1554, 1559 (Fed. Cir. 1992), and "the information must be correct and not misleading." <u>Wood v. Office of Pers. Mgmt.</u>, 241 F.3d 1364, 1367 (Fed. Cir. 2001). When Mr. Nixon remarried, he was entitled to receive full and accurate notice of his election rights with respect to his new spouse, including accurate information as to the costs of electing a survivor annuity for his new spouse.

II

We next address whether, in the circumstances of this case, the notices sent to Mr. Nixon were misleading. We conclude that they were, insofar as, in its October 21, 2001, letter, OPM stated that the cost of the survivor annuity deduction could not be reduced unless Mr. Nixon himself established that his former spouse had remarried, unassisted by OPM, notwithstanding what Mr. Nixon had told OPM about his unsuccessful efforts to obtain his former wife's marriage certificate.

Under section 8341(h)(3)(B)(i), a former spouse's survivor benefits automatically terminate upon remarriage before age 55, and deductions from the annuitant's monthly benefits stop. 5 C.F.R. § 831.632(d) (2005).[4] However, OPM advised Mr. Nixon that he was obligated to provide proof of his former spouse's remarriage. The government contends (and the Board agreed) that 5 C.F.R. § 838.721(b)(1)(vi)(B) & (b)(2) require an annuitant to submit proof of a former spouse's ineligibility before terminating deductions for former-spouse benefits. The regulations contain no such requirement. Rather, they require notice from the former spouse. In applying for survivor benefits, the former

---

[4]     See <u>Holder v. Office of Pers. Mgmt.</u>, 47 F.3d 412, 415 (Fed. Cir. 1995) (5 U.S.C. § 8339(j)(5)(A) automatically terminates spousal survivor benefits upon divorce regardless of notice of divorce to OPM).

spouse must submit to OPM a statement that he or she "will notify OPM within 15 calendar days of the occurrence of any remarriage before age 55," and OPM may "subsequently require recertification" of such a statement.[5]     5 C.F.R. § 838.721(b)(1)(vi)(B) & (b)(2) (2005).

As indicated above, on two occasions, Mr. Nixon stated to OPM in writing that he wished to apply for a survivor annuity for petitioner. In addition, in his last letter to OPM, he wrote that he had been unable to obtain the requested marriage certificate, and he gave OPM his former wife's married name and mailing address and asked OPM to write and request the certificate.

It is true, as the Administrative Judge noted, that it is the obligation of a former spouse to notify OPM of a change in his or her marital status. It is also true that the regulation does not require OPM to seek recertification from a former spouse. Pursuant to 5 C.F.R. § 838.721(b)(2), OPM "may" require recertification that the former spouse has not remarried before reaching the age of 55. However, we think that, if a former spouse fails in his or her obligation to notify OPM of her remarriage, OPM is obligated to check the matter by direct communication, at least when, as here, OPM (i) is told that the former spouse has remarried; (ii) is informed that efforts have been made—without success—to obtain the marriage certificate; and (iii) is provided with the former spouse's married name and mailing address. In other words, OPM abuses the discretion given to

_____

[5]     Contrary to the government's contention, our decision in Cheeseman v. Office of Personnel Management, 791 F.2d 138 (Fed. Cir. 1986), where we held that the burden of proving entitlement is on the applicant, does not authorize any requirement of proof of ineligibility under section 8341(h)(3)(B)(i). See id. at 141-42. Indeed, to the extent that it is pertinent, Cheeseman indicates that the burden is on the former spouse to demonstrate continuing eligibility.

it in section 838.721(b)(2) when it is in possession of the kind of information that it had here but refuses to act by making efforts to contact the former spouse.

The situation here is similar to the one we confronted in Muwwakkil v. Office of Personnel Management, 18 F.3d 921, 924-25 (Fed. Cir. 1994). Under the Spouse Equity Act, OPM must notify a former spouse of an employee's request for lump-sum refund of retirement contributions, 5 U.S.C. § 8342(j), and under 5 C.F.R. § 831.2007(b)(2), an employee on requesting a lump-sum refund is obligated to inform OPM of the existence of a former spouse. In Muwwakkil, the employee did not notify OPM of his former marriage. 18 F.3d at 924-25. We held that OPM was obligated to determine whether a former spouse existed if it had evidence in its files that there might be a former spouse, even if the employee failed to satisfy the regulatory obligation to disclose a former marriage. Id. at 925.

Given the circumstances of this case, OPM's effort to place the burden of proving his former spouse's ineligibility on Mr. Nixon represented an abuse of its discretion under 5 C.F.R. § 838.721(b). It was also contrary to the policy of the Spouse Equity Act, on which 5 C.F.R. § 838.721 is based. The requirement that Mr. Nixon submit proof of his former spouse's remarriage is predicated on the counterintuitive assumption that the relationship between former spouses is cooperative. In Muwwakkil, we stated that the assumption "that Congress [in enacting the Spouse Equity Act] intended to allow the financial rights of one former spouse to be subject to the whim and caprice of the other [is] inconceivable . . . given the acrimonious relationship that often exists between former spouses, and the economic motivation the one might have to misrepresent" the facts relating to the financial rights of the other. 18 F.3d at 925. So

too, here, placing the burden of proving the ineligibility of his ex-wife on Mr. Nixon in the face of what OPM knew, at least as of October 10, 2001, would "allow the financial rights of one former spouse to be subject to the whim and caprice of the other," a result inconsistent with congressional intent.

In the face of the information that it had received from Mr. Nixon, OPM's insistence on October 10, 2001, that it was Mr. Nixon's "burden to provide our office with a copy of your former spouse['s] marriage certificate," was an abuse of discretion and, in the circumstances, incorrectly placed the burden on Mr. Nixon of undertaking further efforts to produce the certificate. In other words, in light of what it had been told, OPM incorrectly stated that, unless Mr. Nixon proved, without any assistance from OPM, that his former spouse had remarried, there would be an additional and substantial cost for electing current spouse survivor benefits.

III

The dissent agrees that, in view of the information Mr. Nixon provided, OPM abused its discretion by refusing his request to contact his former spouse to confirm that she had indeed remarried before age 55. The dissent notes, however, that even though Mr. Nixon was misinformed regarding his obligation to obtain the documentation necessary for terminating his former spouse's benefits, nothing prevented him from electing survivor benefits for his new wife. Under these circumstances, the dissent states, our decision is contrary to Office of Personnel Management v. Richmond, 496 U.S. 414 (1990). In Richmond, a civilian retiree (Richmond) who did not wish to exceed a statutory limit on earnings that would disqualify him from continuing to receive a disability annuity based upon his years of civilian service with the Navy sought advice

from an employee relations specialist at the Navy Public Works Center's Civilian Personnel Department. Richmond sought information about how much he could earn in a retirement job without exceeding the statutory limit. After receiving incorrect information from the Personnel Department, Richmond took employment that caused him to exceed the statutory limit on earnings, as a result of which he lost his disability payments for six months, in the total amount of $3,993. Id. at 416-18. The Court ruled that Richmond was not entitled to recover the lost payments. It held that the misleading information Richmond had received did not estop the government from denying Richmond the payments when he exceeded the statutory limit on retirement earnings. Id. at 415-16.

Our holding today is not contrary to Richmond. We have recognized the command of Richmond. With that recognition, we have stated, however:

> The Supreme Court has held that the government is not generally subject to estoppel or a waiver of restrictions on eligibility for benefits even when the applicant is given misleading information that results in prejudicing his efforts to obtain the benefits. See Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). Congress, however, has specifically directed OPM to inform annuitants on an annual basis of their rights to elect survivor annuities for former spouses, and this court has held, reasonably enough, that a statutory directive to provide such information means that the information must be correct and not misleading. It is not a significant extension of that principle to hold that OPM is required to provide accurate information to annuitants not only in the document that is denominated the annual notice of election rights, but in any other earlier document OPM provides to annuitants on that subject so that the statutorily-required notice is not diluted or contradicted.

Wood, 241 F.3d at 1367.

We likewise do not think our holding today represents a "significant extension" of the principle of correct and non-misleading information. Contrary to the dissent, as Wood recognized, this statutory obligation is not satisfied simply by providing accurate

annual notices; OPM is statutorily obligated to provide accurate information in all its communications to the employee or former employee. See also Hairston, 318 F.3d at 1129-31 (confusing individualized letters from OPM to employee rendered earlier standardized annual notice ineffective, even though standardized notice, standing alone, may have been legally sufficient).

It is undisputed that OPM correctly informed Mr. Nixon of the time he had for electing survivor benefits for his new wife. In addition, we agree with the dissent that Mr. Nixon could have elected survivor benefits for his new wife within the two-year time period. The problem—and this is where we part company with the dissent—is that by improperly advising Mr. Nixon that it was his responsibility to establish his former spouse's remarriage, and by stating that OPM had no obligation to undertake efforts to establish the marital status of his former spouse, OPM allegedly placed Mr. Nixon in the position of having to pay an additional $649 per month (which he should not have been required to pay) if he wished to make a timely election.

IV

In the context of cases where OPM has failed to advise the employee of election rights under the Spouse Equity Act, and there is some indication that the employee wished to elect a spousal annuity, we have not required a separate showing that the error was harmful.[6] However, under our decision in Muwwakkil, we think a different rule prevails where the notification error is predicated on OPM's failure to make a determination of marital status, a determination that is not necessary in every case and

---

[6] See Simpson v. Office of Pers. Mgmt., 347 F.3d 1361, 1365 (Fed. Cir. 2003); Hairston, 318 F.3d at 1129; Wood, 241 F.3d at 1367; Vallee v. Office of Pers. Mgmt., 58 F.3d 613, 615-16 (Fed. Cir. 1995); Brush, 982 F.2d at 1559.

that is reviewable only for abuse of discretion. Under these latter circumstances, we think that a petitioner is required to establish that OPM's error was harmful. Thus, having concluded that OPM erred in informing Mr. Nixon on October 10, 2001, that it was not obligated to undertake efforts to obtain his former spouse's marriage certificate and that that burden fell on Mr. Nixon, the question we must address is whether, as petitioner urges, this was harmful error. In other words, did OPM's letter of October 10 cause Mr. Nixon to forego applying for a survivor annuity for petitioner?

This is a fact-driven question that, in the first instance, should be answered by the Board. In her July 12, 2004, request for reconsideration, petitioner stated that she was prepared to provide affidavits from individuals attesting to her deceased husband's desire to provide her with a survivor annuity. Most importantly, however, she also stated

> We did not return the election form . . . because the additional $645 per month plus the reduction for his former spouse was too much for us to financially handle at the time. So we waited in hopes we could locate [ ] . . . his former spouse marriage information. Again, your office ignored the fact his former spouse was no longer eligible and would not assist in correcting your records.

J.A. at 37. The Board did not address the issue of harmful error because the Administrative Judge concluded that OPM had not erred in the first place. Under these circumstances, we think that petitioner should have an opportunity to establish that it was OPM's error that caused her husband to not apply for a survivor annuity for her. See Muwwakkil, 18 F.3d at 925-26 (OPM's failure to provide former spouse with notice of employee's request for a lump-sum refund of CSRS annuity contributions as required by 5 U.S.C. § 8342(j)(2) required remand for determination of prejudice and available relief).

CONCLUSION

For the foregoing reasons, the decision of the Board sustaining OPM's reconsideration decision denying petitioner's application for a survivor annuity is vacated. The case is remanded to the Board with the instruction that the Board determine whether the error on OPM's part that we have found—refusal to undertake efforts to determine Judy Nixon's marital status in light of what Mr. Nixon had told OPM and the provision of inaccurate information to Mr. Nixon with respect to establishing his former spouse's marital status—was harmful in that it caused Mr. Nixon not to apply for a survivor annuity for petitioner. If the Board finds that the error was harmful, petitioner will be entitled to a survivor annuity. If the Board finds that the error was not harmful, petitioner will not be entitled to an annuity. On remand, the first order of business for the Board will be to decide, after hearing from the parties, whether to conduct further evidentiary proceedings or whether to decide the case on the existing record.

VACATED and REMANDED.

COSTS

No costs.

# United States Court of Appeals for the Federal Circuit

06-3092

CHRISTINE NIXON,

Petitioner,

v.

OFFICE OF PERSONNEL MANAGEMENT,

Respondent.

MICHEL, <u>Chief Judge</u>, dissenting.

The majority improperly conflates two separate issues: (1) whether OPM erred in denying petitioner survivor annuity benefits and (2) whether OPM abused its discretion under 5 C.F.R. § 838.721(b)(2). My colleagues correctly conclude that, in view of the information Robert Nixon provided, OPM abused its discretion by refusing his request to contact his ex-wife to confirm she had indeed remarried before age 55, but awarding petitioner benefits Mr. Nixon never elected on her behalf is not a lawful remedy. I respectfully dissent.

I agree with the majority that if OPM had failed to satisfy its statutory obligation to annually notify Mr. Nixon of his rights of election, our caselaw would preclude OPM from denying petitioner survivor annuity benefits because there was ample evidence that Mr. Nixon wished to make such an election. Here, however, substantial evidence supported the Board's findings (1) that Mr. Nixon <u>did</u> receive the mandatory annual notices, (2) that they correctly informed him of his election rights and (3) that he was fully aware he was required to elect in writing a survivor annuity benefit for his current

spouse within two years of their marriage on December 22, 1999, yet failed to do so. Pursuant to 5 U.S.C. §§ 8339(j)(5)(C)(i) and 8339(k)(2)(A), election by the annuitant within two years of remarriage is a statutory prerequisite to OPM distributing survivor benefits. The majority cites no statutory or regulatory authority for granting petitioner such benefits in the absence of a timely formal election where, as here, the mandatory notice was adequately provided. I believe there is none.

Petitioner does not argue that OPM's annual notices failed to inform Mr. Nixon about his election rights. The cases cited by the majority about lack of notice or ineffective notice – i.e., <u>Hairston</u>, <u>Brush</u>, and <u>Wood</u> – are therefore inapplicable here. What the majority now creates, on its own authority, is a new obligation for OPM to also accurately provide an annuitant with information about the <u>costs</u> of election and obligations for documenting disqualifying remarriages of former spouses, (which may or may not affect whether the annuitant chooses to exercise his or her election rights), above and beyond what is required by statute.[1]

Likewise, <u>Muwwakkil</u> is distinguishable. Pursuant to 5 U.S.C. § 8342(j), OPM is expressly obligated to notify any spouse or former spouse before disbursing a lump-sum payment of retirement contributions under § 8342(a), which terminates any annuity. No analogous statute or regulation requires OPM to notify, much less demand information from, a former spouse when an annuitant chooses to elect benefits for a new spouse. That makes sense because the right to benefits of a former spouse are unaffected. In <u>Muwwakkil</u>, we observed that the purpose of the statute was "to protect

---

[1] As noted by the majority, OPM is only required to "on an annual basis, inform each annuitant of such annuitant's rights of election under sections 8339(j) and 8339(k)(2) of title 5, United States Code." 5 U.S.C. § 8339 note.

former spouses of federal employees from unwittingly being denied support to which by law they may be entitled."  18 F.3d at 925.  Put another way, we held that the Spouse Equity Act imposes additional notice requirements on OPM to prevent an annuitant from secretly taking away any benefits which he has previously elected on behalf of a former spouse.  If we were to apply the reasoning of Muwwakkil to this case, as the majority claims to do, its logical extension would be a holding that Mr. Nixon could not unilaterally affect the rights of his ex-wife without OPM first notifying her, if and when he elected survivor benefits for his new wife, which he never did.  But here, the ex-wife had no entitlement anyway.  Moreover, if the ex-wife had not remarried before age 55, Mr. Nixon's election for his new wife would not have defeated her court-ordered survivor annuity benefits, so there would have been no need for OPM to notify her.

Even though Mr. Nixon was misinformed regarding his obligations to obtain documents necessary for terminating his ex-wife's benefits after her disqualifying remarriage, nothing prevented him from electing survivor benefits for his new wife.  The majority acknowledges that OPM repeatedly warned him that he needed to do so within two years of his marriage.  Moreover, Mr. Nixon was specifically notified that he could "elect the maximum survivor benefit for [his] spouse and then at a later date provide [OPM] with a copy of [his ex-wife's] marriage certificate."  In other words, determining whether his ex-wife was excluded from receiving benefits was an entirely "separate matter," as recognized by Mr. Nixon himself in his correspondence with OPM.  Even if he had eventually prevailed in challenging OPM's refusal to terminate his ex-wife's benefits unless he provided proof of her disqualifying remarriage, it would not have excused his failure to elect survivor benefits for his new wife in a timely fashion.  Cf.

06-3092                                              3

Iacono v. Office of Pers. Mgmt., 974 F.2d 1326, 1328 (Fed. Cir. 1992) (holding that the statutorily-imposed filing deadline for requesting a survivor annuity could not be equitably tolled).

The majority speculates that Nixon acted in reliance on OPM's misinformation in that he wanted to avoid double deductions from his annuity payments. Perhaps so. Under the statutory scheme, however, this cannot change the result. The majority mandates that the petitioner is entitled to a survivor annuity notwithstanding Mr. Nixon's failure to affirmatively make an election on her behalf within two years of his remarriage, (as required by statute), if the Board finds, on remand, that OPM's error was causally connected and therefore harmful. This runs contrary to the longstanding rule that equitable estoppel cannot be used to grant "a money remedy that Congress has not authorized." Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 426 (1990) (explaining that the Appropriations Clause of the Constitution, Art. I, § 9, cl. 7, prohibits any money from being drawn from the Treasury unless authorized by a statute); see also Holder v. Office of Pers. Mgmt., 47 F.3d 412, 414 (Fed. Cir. 1995). The only exception is fraud, which is not alleged here. While the result may seem harsh, all courts have a duty "to observe the conditions defined by Congress for charging the public treasury." Fed. Crop Ins. Corp. v. Merrill, 322 U.S. 380, 385 (1947). With caselaw declaring the unavailability of both equitable tolling and equitable estoppel, I am at a loss to understand what equitable power the majority relies upon. Even if one were identified, I cannot see how, in light of Richmond, it can override the statutory preconditions to disbursing a survivor annuity.

Regardless of the reasons behind his choice not to elect survivor annuity benefits for his new wife, the record conclusively indicates that Mr. Nixon never submitted an application to secure petitioner's entitlement to benefits. "[N]ot even the temptations of a hard case can elude the clear meaning" of 5 U.S.C. §§ 8339(j)(5)(C)(i) and 8339(k)(2)(A). Merrill, 322 U.S. at 386. Accordingly, the Board's decision to deny petitioner's request for survivor annuity benefits was not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. Rather, it was the legally-required outcome.

This does not mean, however, that petitioner is left without any relief. In the alternative, she sought a "refund of all monies reduced from [Mr. Nixon's] annuity benefits" for the six years between his ex-wife's remarriage in 1998 and his death in 2004. Pursuant to 5 U.S.C. § 8339(j)(5)(B), any reduction in his annuity should have been terminated.[2] In light of our consensus conclusion that OPM abused its discretion under 5 C.F.R. § 838.721(b)(2) in failing to contact the ex-wife, I would affirm-in-part, vacate and remand this case for a calculation of the amount of this refund, presumably payable to the petitioner in lieu of Mr. Nixon.

---

[2]    In a letter dated June 10, 2005, OPM acknowledged that it considered Mr. Nixon's ex-wife's potential entitlement to survivor annuity benefits terminated retroactive to February 28, 1998.